236 F.2d 785
 MAGNOLIA PETROLEUM COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
The OHIO OIL COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
The SUPERIOR OIL COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
Wesley WEST, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
 No. 15320.
 No. 15321.
 No. 15352.
 No. 15354.
 United States Court of Appeals Fifth Circuit.
 June 30, 1956.
 Rehearing Denied August 21, 1956.
 
 Ross Madole, Jack E. Earnest, Dallas, Tex., John E. McClure, Washington, D. C., Chas. B. Wallace, Earl A. Brown, Dallas, Tex., for Magnolia Petroleum Co.
 Willard W. Gatchell, Gen. Counsel for Federal Power Commission, Washington, D. C., Lambert McAllister, Asst. Gen. Counsel, William J. Grove, Asst. Gen. Counsel, Louis C. Kaplan, Washington, D. C., for respondent.
 W. Hume Everett, Houston, Tex., C. F. Currier, Shreveport, La., Clayton L. Orn, Findlay, Ohio (Wheat, May & Shannon, Washington, D. C., of counsel), for Ohio Oil Co.
 Willard W. Gatchell, Gen. Counsel for Federal Power Commission, Washington, D. C., Lambert McAllister, Asst. Gen. Counsel, William J. Grove, Asst. Gen. Counsel, Louis C. Kaplan, Washington, D. C., for respondent.
 Roger H. Doyle, New Orleans, La., Cullen R. Liskow, Lake Charles, La., Willard B. Wagner, F. P. Jones, Jr., Houston, Tex., for Superior Oil Co. (Liskow & Lewis, Lake Charles, La., of counsel).
 Willard W. Gatchell, Gen. Counsel for Federal Power Commission, William J. Grove, Asst. Gen. Counsel, Washington, D. C., Lambert McAllister, Asst. Gen. Counsel, Louis C. Kaplan, Washington, D. C., for respondent.
 Jacques P. Adoue, W. H. Skipwith, Jr., Houston, Tex., for Wesley West.
 Willard W. Gatchell, Gen. Counsel for Federal Power Commission, William J. Grove, Asst. Gen. Counsel, Washington, D. C., Lambert McAllister, Asst. Gen. Counsel, Louis C. Kaplan, Washington, D. C., for respondent.
 Before BORAH, RIVES, and BROWN, Circuit Judges.
 BORAH, Circuit Judge.
 
 
 1
 These are separate but companion cases and since they involve substantially similar facts and the same issues of law and come to us on one record they may conveniently be disposed of in one opinion. All of the petitioners herein have invoked the jurisdiction of this Court, under Section 19(b) of the Natural Gas Act, 15 U.S.C.A. § 717r(b), to review certain orders of the Federal Power Commission which petitioners seek to have set aside, vacated and nullified. And all, save Ohio Oil Company, also claim that this Court is empowered under Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009, to review the action of the Commission in issuing said orders.
 
 
 2
 It is believed that a history of the occurrences which give rise to these petitions for review will be helpful to an understanding of the questions involved. On June 7, 1954, the Supreme Court rendered its decision in Phillips Petroleum Company v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 795, 98 L.Ed. 1035, holding that Phillips, a natural-gas producer and gatherer, was a "`natural-gas company'" within the meaning of that term as defined in the Natural Gas Act, and that certain of its admitted sales in interstate commerce of natural gas for resale were subject to the jurisdiction of and regulation by the Federal Power Commission.[1] This decision was contrary to the Federal Power Commission's prior interpretation of its jurisdiction over such activities,[2] and its immediate impact was to charge the Commission with the regulation of a great number of hitherto unregulated jurisdictional sales. Thus confronted with numerous practical considerations in adjusting its activities to the Court's interpretation of its regulatory sphere, the Commission on July 16, 1954, without prior notice or hearing, issued its Order 174 amending and supplementing its long-existent rules and regulations under the Natural Gas Act, 18 C.F.R., Chapter 1, Subchapters A and E through G. These original rules were directed principally to interstate pipeline companies, but since by their terms they speak only of "natural-gas companies",[3] the Commission concluded that save for the issuance of Order 174, they would have been applicable also to jurisdictional sales in the production and gathering portion of the natural-gas business.[4]
 
 
 3
 The Commission's long-established rules, as well as Order 174, were issued under the rule-making authority vested in the Commission by Section 16 and were designed to implement Sections 4, 7, and 8 of the Act.[5] Order 174 prescribed rules and regulations applicable only to "independent producers," that is, natural-gas companies in the producing and gathering area of the business, and they were therein defined as "any person * * * who is engaged in the production and gathering of natural gas and who transports * * * or sells natural gas in interstate commerce for resale, but who is not primarily engaged in the operation of an interstate pipeline." Among other things these rules and regulations prescribed the procedure to be followed by all independent producers, who, on or since June 7, 1954, had engaged in the interstate transportation or sale of natural gas subject to the Act, by providing that they were to: (1) file on or before October 1, 1954, their rate schedules in force on June 7, 1954, and the contracts effective as of June 7 were permitted to be filed as such "rate schedules"; (2) make no changes in the June 7, 1954, rates except after thirty days' notice to the Commission and subject to its right to suspend such changes; (3) apply to the Commission for certificates of public convenience and necessity covering the sale of such gas as is subject to the jurisdiction of the Commission; and (4) continue any sales or services rendered until termination was given the express approval of the Federal Power Commission in accordance with Section 7(b) of the Act. The Commission contends that the rules and regulations provided by Order 174 were formulated with these fixed objectives in view: (a) to relieve independent producers of accounting requirements and the maintenance of accounts under the Commission's Uniform System of Accounts; (b) to provide for simplified filing of gas sales contracts instead of converting such contracts into tariff form before filing and for simplified rate change procedures; and (c) to provide for simplified requirements and limited data in support of applications for certificates of public convenience and necessity.
 
 
 4
 Thereafter and upon further consideration, the Commission on its own motion amended and modified Order 174 by the superseding Order 174-A which was issued on August 6, 1954. Following the action of the Commission, petitioners in company with more than one hundred other persons and corporations applied for a rehearing and stay of Order 174-A. In their applications the validity of the order was challenged on numerous grounds, and, with the exception of Ohio Oil Company, each of the petitioners in its application for rehearing sought to have the Commission make a separate jurisdictional finding that it was not a "natural-gas Company" within the meaning of that term as defined in the Natural Gas Act. By an order issued on September 8, 1954, the Commission afforded all applicants who had questioned the lawfulness of Order 174-A an opportunity to submit briefs and oral argument on the applications for rehearing, but denied all requests for stay, assigning as reasons therefor the following:
 
 
 5
 "In the absence of the rules provided by Order No. 174-A, the more stringent rules generally in effect and applicable to all natural-gas companies would be applicable to producers and gatherers who are also natural-gas companies under the Natural Gas Act (18 CFR, Chap. I, Parts 154 and 157). Accordingly, request for stay of Order No. 174-A is without reasonable justification and must be denied." 19 Federal Register 5952.
 
 
 6
 After the filing of briefs and after oral arguments were had, the Commission, on September 24, 1954, amended Order 174-A in a respect immaterial to the petitions here, and extended the time for compliance with the regulations prescribed therein from October 1 to December 1, 1954, but took no further action at that time on the applications for rehearing. Following this action by the Commission, each of the petitioners herein filed in this Court a petition for review requesting a stay of Order 174-A pending final hearing on their petitions for review. Stays were granted to Magnolia Petroleum Company and to Ohio Oil Company, but not to either Superior Oil Company or Wesley West.
 
 
 7
 On December 17, 1954, which was subsequent to the time when true and correct copies of the documents reflecting all of the action taken by the Commission in issuing Orders 174 and 174-A had been certified and filed in this Court, the Commission further amended Order 174-A and expressly denied all applications for rehearing thereof. The revised sections were published together with the unchanged portions of that order and the order as so revised was designated as Order 174-B.[6] Thereupon Magnolia filed a supplemental petition for review in which it directed against Order 174-B all objections which it had previously made against Order 174-A. Superior by way of a responsive pleading likewise requested that its original petition be considered as directed against and as equally applicable to both orders. In the meantime the Commission had filed motions to dismiss against Magnolia and Ohio and had moved to vacate the stay orders which had been granted to those petitioners, but no motions to dismiss were filed as to Superior and Wesley West.
 
 
 8
 At the outset it should be noted that the Commission urged no objection to this Court's considering the two supplemental requests for review of Order 174-B. While we are of opinion that the ultimate result in these cases will not be affected in the slightest degree by our consideration of Order 174-B, we are nevertheless and by virtue of Section 19 of the Natural Gas Act expressly precluded from considering petitioner's objections thereto for the reason that they have not been previously presented to the Commission in a petition for rehearing. Federal Power Commission v. Colorado Interstate Gas Co., 348 U.S. 492, 498, 75 S.Ct. 467, 99 L.Ed. 583. Accordingly, we shall confine our discussion to Order 174-A.
 
 
 9
 In their petitions for review of Order 174-A, petitioners assert that the order is reviewable, and although they deny that they are "natural-gas companies," petitioners nevertheless insist that they are "independent producers" within the definition of the order and as such they have standing to petition for review. As grounds for vacating, setting aside and nullifying the order, they set forth numerous specifications of error[7] in which they contend that its formulation and substance violate in certain particulars their rights under the Fifth and Tenth Amendments to the Constitution of the United States, and were contrary to the provisions of the Natural Gas Act and the Administrative Procedure Act. In addition they uniformly contend that although Order 174-A purports to be procedural in form, it is actually final and adjudicatory in that it requires and inhibits certain actions, violates their substantive rights and causes them irreparable injury, all of which, under the authority of Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563, make the order subject to review in this Section 19(b) proceeding. In the alternative, they contend that if the order does consist only of procedural rules and regulations, it is nonetheless void for the reason that before the order was adopted petitioners were not accorded the notice and hearing to which they were entitled under the Natural Gas Act and the Administrative Procedure Act.
 
 
 10
 The Commission on the other hand vigorously insists that this Court has no jurisdiction to entertain the petitions for review (1) because petitioners have not exhausted the administrative remedies which are available to them; (2) because petitioners are not "aggrieved" by the order; and, (3) because Section 19(b) of the Natural Gas Act does not provide for review in this Court of orders which merely promulgate procedural rules of general applicability.
 
 
 11
 We agree with the Commission that Order 174-A is not judicially reviewable under Section 19(b) for the reason that it is not an "order" which satisfies the distinctive and controlling conditions to bring it within the purview of the statute. By Section 19(b) Congress formulated the exclusive conditions under which resort to this Court may be had when it provided that: "any party to a proceeding under this act aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the circuit court of appeals * * *." This language of the statute does not authorize a review of every order that the Commission may make and the context of Section 19(b) makes clear the nature of the orders which are reviewable in this Court by requiring that, upon service of the petition for review, the Commission is to certify and file with the Court of Appeals, "a transcript of the record upon which the order complained of was entered." The review provisions of Section 19(b) thus relate solely "to orders of a definitive character dealing with the merits of a proceeding before the Commission and resulting from a hearing upon evidence and supported by findings appropriate to the case." Federal Power Commission v. Metropolitan Edison Co., 304 U.S. 375, 385, 58 S.Ct. 963, 967, 82 L.Ed. 1408;[8] United Gas Pipeline Co. v. Federal Power Commission, 86 U.S.App.D.C. 314, 181 F. 2d 796, 798-799, certiorari denied 340 U. S. 827, 71 S.Ct. 63, 95 L.Ed. 607. It is therefore clear from the language employed as it is from the authorities that the statute in terms contemplates review by this Court of definitive orders entered after hearing and upon completion of the administrative process. Applying this test to Order 174-A it is clear that it did not result from such a hearing upon evidence, and the regulations prescribed therein do not constitute "findings." Indeed under the rule-making power granted in Section 16 of the Act, there was no requirement for either notice or hearing prior to the issuance of such regulations. So, irrespective of any label placed upon it by the Commission or the petitioners, we think it plain that the Commission has simply promulgated regulations of general applicability and not an order reviewable under Section 19(b). The order does not change the petitioners' existing or future status or condition since it is not an adjudication that any particular natural-gas producer is a "natural-gas company" or an "independent producer." The definition of the latter as set forth in the order merely enunciates a classification of certain types of "natural-gas companies," but such a classification in a general regulation does not subject any person or corporation to the Commission's jurisdiction. If persons whose sales of natural gas are such as to bring them within the Commission's jurisdiction, this circumstance arises by reason of the Natural Gas Act itself and not by virtue of the order in question. Furthermore, Order 174-A is not a formal determination of any right or obligation; it is not self-executory and it does not command these petitioners to do or refrain from doing anything. The construction of the regulations and their application in particular situations is still in the hands of the Commission, and this being so we cannot under the limitations of Section 19(b) sit in judgment upon practical business consequences where the action to be reviewed does not represent a definitive ruling resulting from a hearing upon evidence. In fine, and as was pertinently pointed out in Rochester Telephone Corp. v. United States, 307 U.S. 125, 130, 59 S.Ct. 754, 757, 83 L.Ed. 1147, an order is not subject to review if it "does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action. In view of traditional conceptions of federal judicial power, resort to the courts in these situations is either premature or wholly beyond their province."
 
 
 12
 Much of the argument in these cases is centered around the proposition that Order 174-A is reviewable under Section 19(b) by virtue of the fact that the order requires and inhibits certain actions by the petitioners and has the immediate impact of the sort which led the Supreme Court in Columbia Broadcasting v. United States, supra, to regard particular administrative action as ripe for judicial review. This argument presupposes that a parallel can be drawn between the order complained of in the Columbia Broadcasting case and the order sought to be reviewed here and that petitioners are entitled to the same relief under Section 19 (b) as was afforded to appellant in Columbia Broadcasting under the review provisions of the Federal Communications Act. The argument is not persuasive. As we have previously said these regulations do not change petitioners' existing or future status and do not subject them to the Commission's jurisdiction. Order 174-A is not a formal determination of any right or obligation, is not self-executory, and does not command these petitioners to do or to refrain from doing anything. Whereas, in the Columbia Broadcasting case the very existence of the regulations had, without anything more, an immediate effect on the business of the party attacking them. Furthermore, reviewability under Section 19(b) is not equated with irreparable harm, and is not governed by the same tests as reviewability under Section 402(a) of the Federal Communications Act. Section 402(a), prior to its amendment in 1952, made applicable the provisions of the Urgent Deficiencies Act to "suits to enforce, enjoin, set aside, annul, or suspend any order of the Commission" except orders "granting or refusing an application for a construction permit for a radio station, or for a radio station license, or for renewal of an existing radio station license, or for modification of an existing radio station license, or suspending a radio operator's license." 48 Stat. 1093 as amended by 50 Stat. 197. Review of the orders excepted from the provisions of Section 402(a) was by appeal to the Court of Appeals for the District of Columbia under the provisions of Section 402(b) and the review in the Court of Appeals was to be heard upon the record made at the hearing of an application by the Commission. In the Columbia Broadcasting case it was not contended by the parties that the controverted order promulgating licensing regulations was a Section 402(b) order and indeed it was not one. The three-judge District Court in its consideration of the questions there presented determined that it had no jurisdiction to hear the complaint brought by Columbia Broadcasting System for the reason that it did not view the order in question as an "order" within the meaning of Section 402(a). The reasons set forth were that if any of the plaintiffs should thereafter apply for a renewal of licenses and the Commission then adhered to the policy enunciated in the order in question, "the resulting modification of the license will be reviewable only in the Court of Appeals of the District and upon the record made at that hearing. * * Hence, if these actions well lie, the plaintiffs have succeeded in substituting a different court and a different procedure from that which Congress has prescribed for the trial of precisely the same issues. * * * Whatever may ordinarily be the proper scope of the word `order' in the Act * * *, it seems to us clear that Congress could not have intended such an anomalous result as will follow upon treating these particular regulations as such `orders.'"[9] The questions thus posed to the Supreme Court on appeal from this decision were: (1) whether the order in question was an "order" within the meaning of Section 402(a), and (2) if it was such an order, whether the bill stated a cause of action in equity. Considerable doubt had been cast by the lower court's decision as to whether the issues raised in the complaint were relegated to review only after the entry of a Section 402(b) order in which the Federal Communications Commission had effectuated its announced licensing policy. In reversing the three-judge court the Supreme Court concluded that Congress had not precluded a review of these issues under Section 402(a), and held that the order there in question was a reviewable order within the meaning of that section and that the bill of complaint stated a cause of action in equity. In our view the Columbia Broadcasting decision adds nothing to petitioners' case for review for the Supreme Court decided not whether the order was one subject to review in a court of appeals, but only that the order was an "order" which could be attacked in a district court of three judges in a suit which states a cause of action in equity. Whether, as was suggested by some of the petitioners, Section 19(b) precludes injunction proceedings in a district court to restrain the enforcement of Order 174-A is not properly before us and consequently we need not resolve the apparent conflict in the authorities which bear upon this question.[10]
 
 
 13
 Having concluded that the orders in question are not reviewable under Section 19(b) of the Natural Gas Act, there remains for discussion the contention of three of the petitioners that we have jurisdiction to review their petitions under Section 10 of the Administrative Procedure Act. For answer we deem it sufficient to say that we are of opinion that the latter Act adds nothing to our jurisdiction under the Natural Gas Act. Section 10 of the Administrative Procedure Act provides that its provisions are applicable "except so far as (1) statutes preclude judicial review * * *." and the Supreme Court in Federal Power Commission v. Colorado Interstate Gas Co., 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583, characterized Section 19(b) as one of the statutes precluding judicial review within the meaning of that section.
 
 
 14
 In the light of the foregoing and since we hold that we have no jurisdiction to review the regulations in question at this time the other contentions raised by the parties, all of which have been carefully considered do not merit further discussion. Accordingly, separate judgments will be entered in each of these cases dismissing the petitions for review for lack of jurisdiction.
 
 
 
 Notes:
 
 
 [1]
 Section 1(b) of the Natural Gas Act, 15 U.S.C.A. § 717(b), provides: "The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption * * * and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas * * * or to the production or gathering of natural gas."
 
 
 [2]
 See 18 C.F.R. 2.54(b) which, prior to its being rescinded by Order No. 154, July 20, 1950, provided: "For the purpose of administering the Natural Gas Act, the Commission will construe the exemption contained in Section 1(b) [15 U.S.C.A. § 717(b)], to the effect that the provisions of the act shall not apply to the `production or gathering' of natural gas, as including arm's length sales of natural gas, by independent producers and gatherers, made during the course or upon completion of production and gathering. * * *"
 
 
 [3]
 A "`natural-gas company'" is defined in Section 2(6) of the Natural Gas Act as "* * * a person engaged in the transportation of natural gas in interstate commerce,or the sale in interstate commerce of such gas for resale." 15 U.S. C.A. § 717a (6). (Italics ours.)
 
 
 [4]
 The prefatory statement in Order No. 174 reads in part as follows:
 "The rules and regulations heretofore adopted by the Commission pursuant to Sections 4 and 7 of the Act have been directed principally to interstate pipeline companies. Those producers and gatherers which come within the class found by the United States Supreme Court in the Phillips case to be subject to the Commission's jurisdiction should be afforded a reasonable opportunity to comply with the requirements of the Act, to the end that the regulatory objectives of Congress may be achieved within the shortest feasible time. Also, in the interest of consumers, natural-gas companies and the public generally, practical considerations require us to deal with current problems which confront us as a consequence of the Court's decision and a reasonable cut-off date should be fixed in order to avoid confusion in attempting to readjust past transactions. Therefore, we have determined to provide in the first instance, and subject to our further order, reasonably simply rules and regulations applicable to these companies. For these and other reasons, good cause exists for making the rules and regulations herein adopted effective on less than 30 days' notice and for making such rules and regulations applicable to transactions and operations conducted on and after June 7, 1954, the date of the Supreme Court decision in the Phillips Petroleum Company case.
 "Although the decision of the Supreme Court is, of itself, notice to all `independent producers', as hereinafter defined, of their responsibilities and duties under the Natural Gas Act, the Commission recognizes that there may be areas of uncertainty and there may be a few situations where independent producers have, in good faith, endeavored to invoke a price increase provided in a sales contract executed prior to June 7, 1954, or in good faith taken other steps since said date without Commission approval which require the same.
 "Of course, any action which requires Commission approval under the law is not effective without it. The Commission will do all it can to assist in adjusting any such matters, without unnecessary punitive action, to the end that all independent producers will receive like treatment as of June 7, 1954, henceforth." (Italics ours.) 19 Federal Register 4535.
 
 
 [5]
 Section 4(c) of the Natural Gas Act requires every natural-gas company to file with the Commission schedules of its rates and charges in such form as the Commission may designate and prescribe in its regulations. Section 4(d) prohibits, with certain exceptions, changes in rates except after 30 days' notice to the Commission and the public. Section 7(b) forbids the abandonment of facilities or service without the permission and approval of the Commission first being obtained. Section 7(c) prohibits engagement in operations subject to the Commission's jurisdiction unless a certificate of public convenience and necessity has been obtained from the Commission. Section 7(d) requires that applications for certificates be filed in such form, and notice thereof given, as the Commission may require. Section 8(a) authorizes the Commission to prescribe a system of accounts and classification of companies, and requires every natural-gas company to conform its accounts thereto
 
 
 [6]
 In this order the Commission also made it clear that the purpose of the order was not to determine status when it stated:
 "* * * A number of petitions for rehearing urge that the Commission redefine independent producers so as to make more precise the applicability of the statute and rules to those persons brought within the scope of the Act by the decision of the United States Supreme Court in Phillips Petroleum Company v. Wisconsin, 347 U.S. 672 [74 S.Ct. 794]. We recognize the desirability for clarification of jurisdiction in the light of the Phillips decision. This is of serious concern to many independent producers and clarification is desirable not only to prevent unnecessary filings, but to assist those persons having honest doubt as to whether they come under statute. We have no desire to extend our jurisdiction beyond statutory limits. This problem is substantive and not procedural and cannot be dealt with here. Hearings are scheduled and will be concluded at the earliest practicable time in order to facilitate prompt determination of jurisdictional questions."
 
 
 [7]
 The divers specification of error, most of which are common to all petitioners though not identically phrased or bottomed upon the selfsame reasons, are substantially as follows:
 
 
 [1]
 Order 174-A was issued without hearing and without any findings by the Commission of facts based on evidence in support thereof, all in violation of and contrary to the Administrative Procedure Act and Natural Gas Act
 
 
 [2]
 The order was issued without notice thereof and without valid or reasonable grounds being given for the waiver of notice, all as required by the Administrative Procedure Act
 
 
 [3]
 The order does not allow petitioner sufficient time to comply without causing an undue hardship; and it deprives petitioner of the right to examine the officers of its purchasers regarding the volume of gas purchased which will be transported in interstate commerce
 
 
 [4]
 The order, in effect, attempts to regulate the production and gathering of gas by petitioner and others, although under the Natural Gas Act such operations are specifically excluded from the jurisdiction of the Commission
 
 
 [5]
 The order, if enforced, would deny the right to petitioner to determine by its own judgment whether it will or will not further operate in the production and sale of natural gas and the delivery thereof to pipe lines, for transmission in interstate commerce, and whether it will or will not be subject to regulation by the Commission and submit any of its business affairs and operations to the Commission's control
 
 
 [6]
 The order, attempting to fix prices under petitioners' contracts as of June 7, 1954, and prohibiting any increase thereof, is arbitrary and unreasonable and in violation of the Commission's statutory authority for the fixing of rates or the setting aside of existing rates; and the order, insofar as it purports to so fix rates and insofar as it attempts to prohibit the increase of prices for gas sold by petitioner under its contracts, is in further violation of the statutory authority of the Commission
 
 
 [7]
 The order, if enforced, would result in taking petitioner's property without due process of law; and said order would further operate as an arbitrary and unreasonable restraint on and denial of petitioner's liberty of contract, all in violation of the Fifth Amendment to the Constitution of the United States
 
 
 [8]
 The Commission has heretofore in various dockets approved the contracts which petitioner has entered into with purchasing companies who may move such gas in interstate commerce. In granting certificates of public convenience and necessity to the purchasing companies the Commission cannot change the rate, charge or classification provided in such contracts without first granting petitioner a hearing with respect thereto as is provided in the Natural Gas Act
 
 
 [9]
 The order, insofar as it attempts or purports to require petitioner to apply for certificates of public convenience and necessity, to continue with its operations and the sale of natural gas for transmission in interstate commerce, and, insofar as it purports to forbid petitioner discontinuing any service being rendered on the date thereof for the sale of natural gas, is further in violation of the Fifth Amendment to the Constitution of the United States in that it would take petitioner's property without due process of law and would also take petitioner's private property for public use without just compensation
 
 
 [10]
 The order, insofar as it purports to prohibit the discontinuance of production by petitioner of any gas or the deliveries thereof, or from decreasing the amount of gas being delivered, or insofar as it requires production and delivery of gas in any quantities, is contrary to and invades the rights reserved to the States for the regulation and conservation of natural resources by State authority; and the order, therefore, is in violation of the Tenth Amendment to the Constitution of the United States
 
 
 [8]
 The review provisions of the Natural Gas Act and the review provisions of the Federal Power Act which were at issue in the Metropolitan Edison case are identical in all pertinent respects. See 16 U.S.C.A. § 825l.
 
 
 [9]
 National Broadcasting Co. v. United States, D.C., 44 F.Supp. 688, 692
 
 
 [10]
 See Federal Power Commission, et al. v. Union Producing Company, 97 U.S.App. D.C. 223, 230 F.2d 36, certiorari denied 351 U.S. 927, 76 S.Ct. 782; United Gas Pipeline Co. v. Federal Power Commission, supra, 181 F.2d 796; Safe Harbor Water Power Corp. v. Federal Power Commission, 3 Cir., 124 F.2d 800; East Ohio Gas Co. v. Federal Power Commission, 6 Cir., 115 F.2d 385; Carolina Aluminum Co. v. Federal Power Commission, 4 Cir., 97 F.2d 435
 
 
 
 15
 JOHN R. BROWN, Circuit Judge (dissenting).*
 
 
 16
 It is with the greatest of deference that I feel myself under the overpowering compulsion of dissenting from my Brothers in these important and carefully considered cases. My differences are deep and fundamental and rest not at all upon a criticism of these opinions which, with articulate craftsmanship, fairly and honestly set forth the principal facts and expound the contentions. It is my view that these decisions are too much the product of an excision under the artificial sterility of a laboratory test with inadequate regard for the realities. They have absorbed too completely the recurrent plea of the Commission that these cases are not to be reviewed "in a vacuum" — a figure with which I am in agreement as an aid to analysis. A vacuum is to be avoided because a vacuum lacks air, that is, the oxygen, life-giving qualities of facts and actuality. Differing not in the least on the need for oxygen (facts), it is my view that it is the Court, not these records, which has cut itself off from the abundant supply. For it is not only air which we need and which we have, but gas.
 
 
 17
 We have been thrice-told, Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563; Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569; United States v. Storer Broadcasting Co., 351 U. S. 192, 76 S.Ct. 763, that as the heavy hand of Government descends upon citizen or business, the Court need not, in its sheltered retirement, divorce itself from knowledge of life as though it were something profane or permit Government administrators, with their inevitable parochial provincialism, to determine the nature of the activity being scrutinized through the theoretical notions conceived or contemplated in some monolithic redoubt.
 
 
 18
 It therefore seems remarkable to me that in thirty-six cases argued over a week's time presenting nearly every situation confronting the gas industry, the Court finds that not a single one is reviewable.[1] This is done, variously stated, on the ground that none of these actions by the Commission is a definitive "Order" having requisite compulsory characteristics.
 
 
 19
 In my view that comes about from the theoretical approach which does not adequately reckon with the practical everyday processes of the gas industry in its numerous phases, and an appraisal of the impact of these administrative actions in the light of realistic actuality. I think an examination of all of these cases in their major categories will demonstrate the practical decisive business consequences of these actions and, from the standpoint of the technical ripeness or sufficiency of a given case for present review, consideration of all will indicate clearly the existence of at least one case in which each significant point is adequately presented. In this analysis[2] and exposition, I approach each case from the standpoint of the basic question of reviewability and decline to find some way, either on the indicated merits or some procedural aspect, to deny review. When the Court is so overwhelmingly committed to a philosophy of nonreviewability that should be, and is, the point of our departure. As I adhere to this approach, comments or statements may frequently appear in which the merits of a particular contention are assayed. These are not to be understood as a variance from my method. They are put forward not to reflect either tentative, or final conclusions, a pre or partial judgment on them. They are put forward solely to put flesh on these bones, to show the vital impact of agency action and the existence of substantial, serious, frequently difficult questions.
 
 The Standard of Reviewability
 
 20
 At the outset it is plain that, contrary to my Brothers, I find in Columbia[3] Broadcasting System, Inc., v. United States, supra, ample basis for reviewability where regulations thought to be of far-reaching and perhaps devastating effect are yet couched in general terms and directed against no party in particular. Indeed, the presence in the Natural Gas Act[4] of substantial penalties for violation of the regulations brings these cases within the pre-Columbia law.[5]
 
 
 21
 Any lingering doubts must have evaporated with Frozen Food Express v. United States, supra. These regulations were surprisingly similar to those involved here. It was an Ex Parte proceeding, with the report, seventy-one pages in length, listing specific items determined by the Interstate Commerce Commission to be within the agricultural commodity exemption of Section 203(b) (6), 49 U.S.C.A. § 303(b) (6). Reversing a three-judge holding of nonreviewability on the rubric of United States v. Los Angeles & S. L. Railroad Co., 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651, the Court sustained reviewability since, "The determination by the Commission that a commodity is not an exempt agricultural product has an immediate and practical impact on carriers who are transporting the commodities, and on shippers as well. * * * The determination made by the Commission is not therefore abstract, theoretical, or academic. * * * The `order' of the Commission which classifies commodities as exempt or nonexempt is, indeed, the basis for carriers in ordering and arranging their affairs. * * * Carriers who are without the appropriate certificate or permit, because they believe they carry exempt commodities, run civil and criminal risks. * * * Carriers and shippers alike are told that they are or are not free to bargain for rates, that they must or must not pay the filed charges. The `order' of the Commission is in substance a `declaratory' one * * 5 U.S.C. § 1004(d), 5 U.S.C.A. § 1004(d), which touches vital interests of carriers and shippers alike and sets the standard for shaping the manner in which an important segment of the trucking business will be done. * * *" [351 U.S. 40, 76 S.Ct. 571.]
 
 
 22
 And Frozen Food was followed shortly by Storer Broadcasting Company, supra, holding general regulations determining eligibility for TV station licenses were orders reviewable at the suit of one in that business prior to the denial of a specific license application for, the Court said [351 U.S. 192, 76 S.Ct. 769], "The Rules now operate to control the business affairs of Storer. * * * Storer cannot cogently plan its present or future operations. * * * These are grievances presently restricting Storer's operations." The Columbia[6] doctrine has an expansive vitality to require that Courts view these matters in the light of a living world.
 
 I.
 Order 174 Cases
 
 23
 A consideration of but a few parts of Orders 174 A or B will demonstrate, I think, that the action of the Commission has tremendous practical, direct business consequences on those who produce natural gas.
 
 
 24
 The Order Determines Who Is Subject to the Act
 
 
 25
 When it is recalled that the whole sweep of the 174 Orders is to outline action to be taken by those brought under the Act by the Phillips decision, the definition[7] of "Independent Producer" has a positive and practical effect on the industry. This is so because it is the imprimatur of the Commission itself on the Phillips decision and, more so, it is one of doubtful validity. The doubt arises because the definition comprehends all those engaged in the production or gathering of gas who sell it in interstate commerce for resale. By its terms no distinction is made between those who sell before and those who sell after the production and gathering is completed. The regulation therefore reflects the Administrator's interpretation[8] of an opinion which is, or may be, read much differently by others.
 
 
 26
 Whatever else the Court meant to say or do, it seems plain to me that the Court was being careful to point out that sales made during production or gathering were not within the scope of the decision:
 
 
 27
 "* * * production and gathering, in the sense that those terms are used in § 1(b), end before the sales by Phillips occur." 347 U.S. at page 678, 74 S.Ct. at page 797, 98 L.Ed. at page 1045.
 
 
 28
 Nothing in that opinion[9] impairs the authority of its prior holdings that Section 1(b) "* * * precludes the Commission from any control over the activity of producing or gathering natural gas", Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 603, 65 S.Ct. 829, 839, 89 L.Ed. 1206, 1223; that the Commission has no power "* * to regulate the physical production and gathering of natural gas in the interests of conservation or of any other consideration of legitimate local concern", Interstate Natural Gas Co. v. Federal Power Commission, 331 U.S. 682, 690, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742, 1748; that the regulations of the Commission may not be "* * * inconsistent with the exercise by [the states] * * * of the powers over production and gathering of natural gas reserved to it by Congress in § 1(b) of the Act", Id., at 331 U.S. 691, 67 S.Ct. 1487, 91 L.Ed. 1748.
 
 
 29
 It is because of the genuine and reasonable basis for difference in the interpretation of the Phillips opinion that the regulatory definition has such an impact. Until there was an administrative definition describing those persons who would come within the meaning of the Phillips decision, it would be a matter of individual interpretation. Even though it were ultimately determined by subsequent proceedings that such interpretation was the correct one, no one in the interim could have been subjected to penalties for the violation of a regulation (since none existed) and the continued reasonable doubt about the interpretation itself would prevent the severe penalties for a criminal violation under Section 21(a), 15 U.S.C. A. § 717t(a).
 
 
 30
 But with the definition by regulation, all of that is removed. All that is left now for the individual is the ultimate validity of that definition. By force of this definition, one who produces natural gas and sells it for resale in interstate commerce is conscious that he is then subject to the Act and must conform all of his activities to it and must take the specific action which other sections of the Order command. I shall show in subsequent detail what these are, but even without this, it is completely unrealistic to say that profound consequences are not imposed when the Order, at its outset, transmutes, for example, the owner of the working interest in a small gas well from a simple entrepreneur into a quasi public utility. Like the trucker who hauled grapefruit and seeks frozen chickens to eliminate a dead haul, cf. Frozen Foods, supra, this act of Government has changed his whole economic life.
 
 
 31
 The Order Requires Filing Of Rate Schedules
 
 
 32
 In the face of the positive command for the filing of rate schedules[10] as of June 7, 1954, by all "Independent Producers", it is difficult for me to follow the majority's statement (Magnolia No. 15320), "* * * Order 174-A is not a formal determination of any right or obligation; is not self-executory, and it does not command these petitioners to do or refrain from doing anything. * *"
 
 
 33
 Since the Order (§ 154.92) is directed to an "Independent Producer" who is, in turn, defined in § 154.91 to be those who make interstate sales while producing and gathering, this regulation is an immediate, positive, firm, absolute requirement for the filing of rate schedules. It is plain and unequivocal in its terms, and being a regulation, it subjects those who fail to comply to the severe penalties (note 4 supra) of $500.00 for each and every day during which such offense occurs." Not only does it subject the producer to fines and penalties, but the filing of these contracts by its nature turns his business into one of public concern. What was the moment before Order 174 his business, now becomes the Commission's business. It may be that ultimately that is what the Phillips decision intended and the regulation will have a validity to achieve that end. But that does not remove the fact of the impact of this regulation upon this business man. It, and it alone, compels him under the pain of immediate penalties to alter his whole business concept.
 
 
 34
 And in this situation particularly, it is the impact of the regulation alone which brings about the necessity for filing of the rate schedules. The Act itself is not self-executing and requires the regulations as a condition precedent.[11]
 
 
 35
 Moreover, this specific provision of the Order illustrates well the futility of later, or more, or subsequent proceedings which the Commission insists are necessary to satisfy the requirement of exhaustion of the administrative process. E. g., Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638; Public Service Comm'n of Utah v. Wycoff, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291; Canadian River Gas Co. v. Federal Power Commission, 10 Cir., 110 F.2d 350, rehearing denied, 10 Cir., 113 F.2d 1010, certiorari denied 311 U.S. 693, 61 S.Ct. 76, 85 L.Ed. 449; United Gas Pipe Line Co. v. Federal Power Commission, 86 U. S.App.D.C. 314, 181 F.2d 796, certiorari denied 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 607. If a regulation is not valid either because it is too sweeping or, as claimed by some of these petitioners, it covers a person not within the Act, how is it to be tested? If the complaint is directed against a regulation compelling the filing of private papers, what more is needed to test that than the Order itself? What sort of administrative proceeding is reasonably needed if a citizen conscientiously thought that this provision of the Order was illegal? Must he surrender the very papers for public perusal which he contends are his own business? If he is hurt because he is threatened with the necessity of surrendering private documents, has it not become incurable if to test it, he must first comply?
 
 
 36
 The Order Requires Filing of Changes in Rate Schedules
 
 
 37
 Equally compelling, Section 154.94, is the imperative command that, "No change shall be made in any rate, charge, or service in effect on and after June 7, 1954, for the interstate * * * sale of natural gas * * * by any independent producer required to file rate schedules pursuant to Section 154.92 hereof, without first filing a change in rates pursuant to Section 4(d) of the * * * Act and in accordance with this section."
 
 
 38
 No status determination is needed here. The definition is "Independent Producer" and a sale which makes him one under Section 154.91 is all that is needed. From that moment on the regulation by its own terms is self-executing to impose the mechanical obligation of preparing and filing all such changes. Not only does that impose an obligation subjecting the producer to a $500.00 daily fine for noncompliance, but this has an immediate effect in circumscribing the nature and extent of his business negotiations, transactions, and agreements which he may make, or desire to make, with present or prospective customers. Surely an Order which states that no change can be made unless it is first filed has real and far-reaching effects. The very imminence of such a regulation calls for the immediate reconstruction of one's business. In the fundamental concept of its nature, it has, in the twinkling of an eye, ceased to be private and now becomes clothed with a certain public interest, or at least a certain public control.[12]
 
 The Order Prohibits Automatic Contract Escalations
 
 39
 Here, without a doubt, the regulations promulgate a new and revolutionary policy having substantive consequences of great importance. For the Order, in connection with its requirements concerning the filing of rate schedules and changes in rate schedules, categorically states that contract escalations are a change of rate.[13] This has a substantial and immediate twofold impact: first, from a technical, procedural point of view, it has the effect of making the escalated rate a "new" or initial filing under Section 4(d, e), with the complex problems of burden of proof and interim suspension flowing from that; and, second, the inability of the parties as a matter of actuality to enjoy the complete, prompt and uninterrupted performance of the agreements as made by them.
 
 
 40
 At the heart of both is the fact that, "* * * the Act, * * * evinces no purpose to abrogate private rate contracts as such. To the contrary, by requiring contracts to be filed with the Commission, the Act expressly recognizes that rates * * * may be set by individual contracts. * * * The obvious implication is that, except as specifically limited by the Act, the rate-making powers of natural gas companies were to be no different from those they would possess in the absence of the Act: to establish ex parte, and change at will, the rates offered to prospective customers; or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer. * * * By preserving the integrity of contracts, it permits the stability of supply arrangements which all agree is essential to the health of the natural gas industry." United Gas Pipe Line Co. v. Mobile Gas Service Corporation, 350 U.S. 332, 76 S.Ct. 373, 378.
 
 
 41
 The petitions before us adequately show that these gas producers each have long-term contracts with various gas purchasers, interstate transmission pipeline companies in which, following the traditional usage of the industry with the full approval of regulatory agencies, provision is made for the automatic increase in the price of the gas under the stated conditions. The escalation provisions are the direct outgrowth of the necessities of the contract and of the pipeline purchaser. Those proposing an interstate transmission pipeline must have two principal things: one, financing in astronomical sums, and, two, certificates of public convenience and necessity from the Commission. Investment bankers and underwriters of these securities require long-term supply and outlet commitments to justify the economic forecasts of the promoter. And the regulatory agency which, by the Certificates both approves the construction of the line and the issuance of securities for its financing, demands a like showing to establish fitness, ability and capacity to serve.[14]
 
 
 42
 The imperative requirement that the purchaser have a long-term contract makes it essential that, in the ordinary course of business judgment, the seller have some means of protecting himself against the unpredictable fluctuations or developments in the twenty-year period. These take the form normally of automatic step increases in price at stated times or intervals and "Favored Nations" clauses, single or general, to assure that the seller has the opportunity of enjoying the general increase in the value of gas in the area, reflected by genuine, good faith transactions or tenders, and, invariably, for proportionate increases in production, severance, or similar state taxes.
 
 
 43
 The immediate effect of this Order is, therefore, to destroy the binding character of the agreement made between seller (producer) and purchaser (pipeline). The rate may ultimately be the same, but only after someone has convinced the Commission, or Court, or both that what the parties agreed to do was fair, just and reasonable.
 
 
 44
 The Commission seeks to avoid this impact by insisting that the contract "rate" preserved by Mobile, supra, is the one being charged at the particular time and that what is payable before or after is of no consequence. That may ultimately be the rule of law. But it is not the rule of business and to assert it by this Order subjects these parties to real and damaging and pressing results. It becomes all the more devastating when, as I shall later discuss, we consider the effect of the Order requiring that an Independent Producer file an application for a Certificate of Public Convenience and Necessity to institute a sale and secure approval before he may abandon it. For here by virtue of the Order 174 regulations, a person who, at the time of the contract, was considered an individual enterpriser under no Governmental restraint or regulation, is suddenly informed that the contract rates to be paid to him in the last half of the contract period (and without which he would not have made the bargain) have no validity as a contract henceforth, and if collectible, they are so only by order after a hearing by a Governmental bureau. Anyone outside of a courtroom would say that that was a real and present impact. I think Judges must recognize it as well.
 
 
 45
 And this business impact is not limited to pre-existing contracts. These petitioners are engaged in the search for and continuous production of gas. How can it be said that the presence of this regulation evincing a determined radical change in policy does not have a weighty and pressing effect upon current business judgments and transactions? If truck owners and television station owners are given the protection of judicial reviewability of orders of general application, regulations which alter markedly their business activity or immediately encumber, frustrate or handicap business plans, Frozen Foods, supra, Storer, supra, I would think these producers make out as appealing a case. As long as this regulation stands, new contracts cannot be made which give this margin of protection against unknown future changes over the long contract periods. Somehow the business man, as the gas producer, will have to adapt his activities to that situation. If he raises his rates to secure the aggregate of what was formerly on a sliding scale, he may lose the purchase-sales contract. If he reduces the price to a lower figure, he may soon find himself with a contract out of harmony with his neighbors. The point here is not whether this is good law or bad law; whether the regulation is valid or invalid — it simply is that as long as it stands undetermined all business is unavoidably affected by it.
 
 
 46
 Until this regulation is tested and the validity of this policy is determined, a major industry must speculate. This is a serious and troublesome point of law which a Court must and may determine. These Order 174 Cases and the Suspension Cases present it adequately for in both the Order does have an immediate, far-reaching consequence.
 
 
 47
 Nor can the impact of this pervasive policy against contract escalations be avoided or lessened by self-help,[15] since the customer (purchaser) of one of these producers is invariably an interstate pipeline transmission company and, being licensed under Certificates issued by the Commission, it is forbidden in fact and practice to pay more for its gas requirements than approved contracts permit. The present customer (purchaser) under an existing contract cannot pay more even though it is in accordance with its agreement and it desires to do so, and the seller (producer) can find no relief by a termination of the contract since, as we shall see, Commission consent is demanded under the Order for termination or abandonment.[16]
 
 
 48
 This administrative prohibition of automatic contract escalation provisions also has important, far-reaching, immediate and pressing technical consequences in the administration of the Natural Gas Act. These consequences, while technical, have profound substantive results. This is so because Section 154.94, if valid, makes an automatic contract rate increase, a "change in the rate schedule." If it is a "new" rate by virtue of the regulation, it then falls under Section 4(d) of the Act requiring filing and notice before its effective date and, more so, it is then subject to Section 4(e) which gives the Commission the right to suspend for five months and require a repayment surety bond for subsequent collections until the rate hearing is completed. To these sanctions is added a burden of proof to show that the increased rate is just and reasonable.[17] On the other hand, if the automatic escalation increase is but a part of the entire total contract rate,[18] the application of the automatic increase is not the promulgation of a new rate, and the review[19] of such rate would be by a hearing pursuant to Section 5(a), 15 U.S.C.A. § 717d(a).
 
 
 49
 The Suspension Cases before us and the administrative experience[20] of the Commission demonstrate that this is no idle, academic, theoretical difference. It is the difference between suspension and no suspension, between money in the producer's hands and money in the purchaser's.
 
 
 50
 The Order thus introduces a revolutionary policy reversing a known business and administrative practice approved over the years. It is the regulation which does this and not the statute since, in the absence of the regulation, it would be open to producers and purchasers to place their own good faith construction upon Section 4(d) of the Act. But the regulation is imperative: a failure to file subjects the producer to a daily fine of $500.00. To collect the "new" rate, if the purchaser would pay it, would be another violation. Substantial doubts exist concerning the validity of the regulation. The doubt arises on its face. The danger and consequence, if invalid, is pressing and immediate. And no further record proof or evidentiary facts is needed to make it ripe for judicial determination.
 
 
 51
 The Order Requires Application for Certificate of Public Convenience and Necessity
 
 
 52
 The Order Forbids Abandonment-Termination of a Sales Contract without Commission Approval
 
 
 53
 The purpose of the Commission to bring all producers within the scope of its interpretation of the Phillips case (defined in Section 154.91) and to subject all such producers to the severe obligations of a public utility is manifest by Section 157 of the Order. Certificates of Public Convenience and Necessity[21] must be obtained for each service and the service may not be abandoned[22] without Commission approval.
 
 
 54
 As in the case of other sections of the Order which I have discussed, the regulation has a force transcending the Act. In the absence of a regulation, it is left to the individual gas producer to determine whether he comes under the Act, is a natural gas company, whether the Act, Section 7(c), is to cover sales, whether the sale is one bringing him within the Act or the Phillips decision and, on termination or abandonment, whether the sale is a service rendered by means of jurisdictional facilities. If he or his lawyer guess wrong, he is exposed to the possibility of enforcement proceedings, Section 20, 15 U.S.C.A. § 717s, or criminal prosecution, Section 21(a), for "willfully and knowingly" doing an act "declared to be unlawful," or as one who "omits or fails" to do an act "required to be done".
 
 
 55
 But with the regulation, all this is removed. It peremptorily requires the filing of an application for a Certificate, forbids the continuation of an existing, or the commencement of a new, service without it and forbids termination. Failure to comply subjects the person automatically to the penalties of $500.00 for each and every day during which noncompliance continues, Section 21(b). And all that would be open to determination would be the validity of the regulation.
 
 
 56
 It is just as obvious that these dual commands subject those in the gas business to substantial and immediate business consequences. As to existing contracts, the seller (producer) is helpless in his effort to enforce the mutual obligations for automatic escalation rate increases. His purchaser may not pay him the agreed increase. He must file his application as an "initial" rate under Section 4 and suffer the risk of a suspension and the burden of establishing the reasonableness of the rates. His only relief of self-help — that is, termination — is denied him because he must obtain Commission consent here as well. Whether as to existing contracts or the making of new ones, a producer knows that this subjects him to the far-reaching responsibilities of a public utility — a status which courts are reluctant to impose because of the inevitable encroachment upon normal business freedom unless the statutory command is clear, Munn v. People of the State of Illinois, 94 U.S. 113, 24 L.Ed. 77; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103. All persons dealing with a defined gas producer, whether banker, investor, processor, transporter, or purchaser, would of necessity have to trim negotiations and the final agreement to the pattern of public utility and its potential governmental regulation. Business men would know this instinctively. Judges, I think, should know as much.
 
 
 57
 And yet there is, at least, a substantial question whether the Act justifies a regulation imposing this status on the mere sale of gas, even one within the orbit of the Phillips case. There is a strong likelihood that the terms of the Act and legislative history will confine certification requirements to those constructing and operating physical facilities.[23]
 
 
 58
 There is even greater doubt concerning the right to forbid or regulate abandonment of sales since the Act[24] relates expressly to service by jurisdictional facilities. The Congressional purpose[25] to restrict the prohibition against abandonment to services rendered by jurisdictional facilities seems quite plain and is, interestingly enough, apparently acknowledged by the Commission.[26] If, then, the proper construction of 7(b) is that it relates only to services rendered by jurisdictional facilities, the regulation would be invalid in prohibiting termination of sales contracts unless the given sale was accomplished through physical facilities owned or operated by that producer in the performance and rendition of the sale and such facilities were "subject to the jurisdiction of the Commission."
 
 
 59
 And finally, the petitioners urge with much basis, the sale of gas by a producer from a producing well is a direct and immediate part of production and is therefore within the full protection of Section 1(b). Nothing in the Phillips decision detracts from prior holdings that the Commission is powerless to regulate, forbid, prohibit, or direct the production of gas, Federal Power Commission v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499.[27]
 
 
 60
 If, without let or hindrance from the Commission, a certificated natural gas company can surrender or transfer its leases — that is, the right to the gas — because the leases and the gas covered thereby are a part of production, it seems difficult to believe that a producer cannot determine whether he will continue to permit gas which he is producing to leave his well, and if so, whether it shall go to one or to the other.
 
 
 61
 The present Order forbids this. It is ever-present in the shaping of gas transactions. And in the Abandonment Cases before us, it has kept particular gas producers from enjoying the fruits of and complying with the contracts made by the new purchasers with consequent substantial money losses.
 
 The Order Compels Other Action
 
 62
 By operation of the Order, the magic date of June 7, 1954, is of critical importance. If it is valid, it orders a rollback of rates to a prior date. Imposing a retroactive rate which is beyond the general power of the Commission subjects producers to real and immediate harm. If it is not valid, it requires no record, no evidence to determine it. These and many other specific impacts result from the Order, but those discussed sufficiently illustrate the practical consequences and the ripeness now for judicial review. Serious questions of law call for an immediate determination by constitutional courts. Neither orderly administration nor due regard to the separation of executive and judicial functions compels or suggests that review should be postponed.
 
 II.
 Suspension Cases
 
 63
 In each of the Suspension Cases, the producer sought to collect the increased rate resulting from automatic contract escalation provisions. These rate increases were treated as "new" filings under Section 4 and were suspended for various periods of time. As thus presented each involves the question discussed at length concerning the nature of escalation increases and the Commission's power to forbid them. That is a serious question of law with substantial arguments on both sides. If what I have said is correct, then these petitioners in the Suspension Cases are certainly aggrieved and, as to them, the question is ripe for judicial review.
 
 
 64
 But the majority never gets to this point for the holding is simply that a suspension order, even though invalid, is not a Section 19(b) "Order." In my judgment, this ignores the significant absence of any modifying term such as "final" in Section 19(b) and is, again, a situation in which the Court has closed its eyes to reality. A suspension order is final in fact. As these verified petitions reflect, for the period of suspension the seller has been unable to collect what he claims is the rightful increase in rate. This amounts in dollars to huge sums of money individually and collectively. There is no relief because the Commission has no power to award reparations or to impose out of current rates an amount needed to make up for a past deficiency due to an improvident suspension.[28]
 
 
 65
 Testing reviewability the hypothesis must be that the Order is invalid. On that assumption what more is needed, either to impose real, pressing, irreparable injury, or to present for review the serious question of law? Each of these Suspension Cases presents the common question: Is an escalation increase subject to suspension? If it is, then the matter must grind through the administrative process. If it is not, then no facts, no evidence, no peculiar circumstances can make it such. And the Commission's suspension order, in such an eventuality, ought to be set aside to restore the parties to their prior condition so near as the law may do it. Of course, the Commission cannot, to defeat reviewability, assert that "facts" are needed to prove that petitioners are subject to the Act, for the very act of issuance of the suspension order is a finding of coverage. Petitioners may question it on the review when granted, but the Administrator can not claim he lacked power to do what was done.
 
 
 66
 Moreover, it should be remembered that a suspension is a unique procedure from the standpoint of both the gas company and the Commission. The Commission's power is extremely limited. It may invoke it only within the 30-day notice time and it may not extend it beyond five months. Once the rate becomes effective, it is assumed that no power to suspend can be revived. Once the five months has expired, the power is gone except insofar as the surety bond may continue it conditionally in effect. It is entirely separate from the hearings which must be held, United Gas Pipe Line Co. v. Mobile Gas Service Corporation, supra, and whatever is done within the five months is forever and irretrievably final. When one seeks a judicial review of an order assumed to be invalid because it forever deprives a person of his right to recover substantial sums of money presumably due under a contract, and the question of its validity will have no bearing whatsoever on the ultimate approval of the rates involved, the appeal is not an effort, as characterized by my Brothers, to disturb the orderly administrative processes.
 
 
 67
 Precisely this problem — an illegal suspension order — was presented in Atlantic Seaboard Corporation v. Federal Power Commission,[29] 4 Cir., 201 F.2d 568, and jurisdiction under Section 19(b) was sustained. I have searched in vain for those facts or legal principles which have led my Brothers to state, "We think that case is clearly distinguishable from the case at bar." And to it may now be added Phillips Petroleum Co. v. Federal Power Commission,[30] 10 Cir., 227 F.2d 470. See also, Isbrandtsen Co., Inc., v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, certiorari denied Japan Atlantic and Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124; Algonquin Gas Transmission Co. v. Federal Power Commission, 1 Cir., 201 F.2d 334. If the order is the only one which can ever be entered and no collateral proceeding depends upon it, it is sufficiently final, when realistically appraised, to permit reviewability where, on the hypothesis or substantial showing of doubtful validity, great and pressing harm will flow.[31]
 
 
 68
 Nor, in my view, does reviewability of the Suspension Cases depend finally on invalidity of the regulation forbidding automatic escalation. The parties raised other and substantial questions concerning the sufficiency of the administrative process. These include the repeated use of stereotyped suspension orders magnified in several instances by other stereotyped denials of rehearing and whether such rubber-stamped treatment met the demands of the statute that the Commission, in suspending, shall deliver "to the natural-gas company affected thereby a statement in writing of its reasons for such suspension," Section 4(e); Amarillo-Borger Express v. United States, supra, and Long Island Railroad Company v. United States, supra. And, as to at least two of them (Stanolind 15627 and Continental 15678), the action bordered upon complete administrative irresponsibility since for the very same contracts covering the very same gas out of the very same wells, the Commission found, in the stereotyped rubric, that the identical rate should be suspended as to one seller but not as to a co-seller. In this and the other respects the State Tax Escalation Cases likewise fit in this category.
 
 III.
 Abandonment Cases
 
 69
 In each of these cases, the producer (seller) had a right under the contemporary contracts to terminate the sale of gas. In one there was the right to obtain an increase in the price if bona fide offers were available from others. The current customer declined to meet the tendered increase, and the producer sought to exercise the contract right of termination and sell gas in the future to the new purchaser at the increased price. In the other, the producer sought to exercise his contract right to select his own purchaser and conclude a gas sales agreement with that new purchaser. By whatever label described, the letters and orders of the Commission have effectually prevented the producer from exercising the right to terminate, that is, abandon the sales contract. This is done pursuant to the indicated sections of Order No. 174. If, as the analysis indicates, there is substantial doubt that Section 7(b) covers sales when no jurisdictional facilities exist, that order is an illegal one depriving the petitioners of immediate, substantial benefits. If that order is illegal, it is so because of the limited nature of Section 7 (b), and no facts, no evidence, no record is needed or essential to an orderly presentment of that substantial and serious question.[32]
 
 
 70
 By virtue of Section 154.97 (cancellation of rate schedules) and Section 157.23 (b), it was likewise necessary for these petitioners to file notice of termination of rate schedules and a request for the issuance of a new Certificate of Public Convenience and Necessity for sale of the gas to the new purchaser. If, on the analysis I have set out, these regulations are beyond the power of the Commission, it means that by their operation, the petitioners have been deprived of the immediate enjoyment of their private contract rights. That issue is present and has immediate consequences.
 
 IV.
 State Tax Escalation Cases
 
 71
 These cases raise the question of the collectibility of increases in the Texas State Production Tax as provided under automatic rate increase escalation provisions in the contracts. Thus they present, in dramatic fashion, the question so vigorously argued by all petitioners on the propriety of the regulation forbidding escalation clauses. The Court in arriving at a decision, presumably on the merits, completely bypasses this question. If, as my discussion indicates, that order may be invalid, then the Commission had no right in these cases to forbid Continental Oil Company from collecting the increase from its effective date (September 1, 1954). (I do not decide this question since I think it too important to determine until we, as a Court, reach it for deliberative joint judgment.) Moreover, the Court's opinion in emphasizing the fact that there was no proof in the record of discrimination in favor of other companies under like situations overlooks the fact that the petition for rehearing, declined by the Commission, raised those facts and that charge. When it was overruled, I am at a loss to understand how the petitioner could have made any proof. Finally, while the transmutations of the order and the change of dates from September 15 to October 1 and December 1 as set forth in the opinion is accurate, it seems to me that the whole Act imposes on the Commission the necessity of having some reasonable basis for its actions. Conceding, for the moment, that there was intended significance in what appears to me to be inadvertent scrivener errors made under circumstances of understandable and almost hysterical pressure, I would have considerable doubt that a Commission may say to one Texas producer that if the application is filed on October 1, the increase can relate to September 1, but if it is filed on October 2 or November 29, it may not. Not a single reason has yet been advanced to justify that differentiation, and it is evident from the fact that the 174 Orders finally extended filing dates to December 1, that the Commission did not articulately do this because of some administrative necessity. Finally, since the Court does reach some of the merits here, I can find in the record no basis for assuming that the sales involved in these contracts were within the jurisdiction of the Commission. Such findings and evidence is necessary. Securities Exchange Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626; Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733; see also, Panhandle Eastern Pipe Line Co. v. Public Service Commission, 332 U.S. 507, 512, 68 S.Ct. 190, 92 L.Ed. 128, 135.
 
 
 72
 I have written at such length as my views in all cases because I think these many troublesome legal questions are begging for a Judge's answer. What the answers will be, I do not known. But the Commission by its 174 Orders and action in the individual cases has presented cases ready and ripe for adjudication.
 
 
 73
 We shut ourselves off from life if we think that that which has had the gas business in such turbulence has, as yet, no effect or impact.
 
 
 74
 I therefore respectfully dissent.
 
 
 
 Notes:
 
 
 *
 Editorial note:
 This opinion was prepared and filed as a separate opinion in each of the following cases: No. 15320. Magnolia Petroleum Company v. Federal Power Commission, 236 F.2d 785; No. 15321. The Ohio Oil Company v. Federal Power Commission, 236 F.2d 785; No. 15352. The Superior Oil Company v. Federal Power Commission, 236 F.2d 785; No. 15354. Wesley West v. Federal Power Commission, 236 F.2d 785; No. 15471. Gulf Oil Corporation and Gulf Refining Company v. Federal Power Commission, 236 F.2d 812; No. 15470. The Texas Company v. Federal Power Commission, 236 F.2d 813; No. 15461. Union Oil Company of California and Louisiana Land and Exploration Company v. Federal Power Commission, 236 F.2d 816; No. 15704. Humble Oil & Refining Company v. Federal Power Commission, 236 F.2d 819; No. 15627. Stanolind Oil & Gas Company v. Federal Power Commission, 236 F.2d 824; No. 15678. Continental Oil Company v. Federal Power Commission, 236 F.2d 827; No. 15799. Hunt Oil Company v. Federal Power Commission, 236 F.2d 828; No. 15928. Hunt Oil Company v. Federal Power Commission, 236 F.2d 828; No. 15832. Ralph B. Shank, Trustee for Nelson Bunker Hunt Trust Estate, v. Federal Power Commission, 236 F.2d 830; No. 15749. Roy Lee, Trustee for Hassie Hunt Trust, v. Federal Power Commission, 236 F.2d 835; No. 15706 through No. 15721 (16 cases) Continental Oil Company v. Federal Power Commission, 236 F.2d 839.
 
 
 [1]
 If our decisions and Amerada Petroleum Corporation v. Federal Power Commission, 10 Cir., 231 F.2d 461, stand, there is no review of these substantial questions in sight, for Federal Power Commission v. Union Producing Company, 97 U.S.App.D.C. 223, 230 F.2d 36; Gulf Oil Corporation v. Federal Power Commission, 97 U.S.App.D.C. 227, 230 F.2d 40, foreclose the equity injunction. During the four days' argument of these cases, I vainly sought from anyone or all of the battery of advocates for the Commission, even a hypothetical situation in whichsome gas producer involved in some situation could have some significant review. Apparently some slight character of "review" is given to the State Tax Escalation Cases (note 2, infra), but in the setting of the approach of nonreviewability in the fundamental jurisdictional situations and the complete bypassing of those problems (though present) in this one group, it indicates to me that in fact no review is really recognized even there.
 
 
 [2]
 For convenience I group and refer to the cases in these categories: I. Order No. 174 Cases: No. 15320, Magnolia Petroleum Company, 236 F.2d 785; No. 15321, The Ohio Oil Company, 236 F.2d 785; No. 15352, The Superior Oil Company, 236 F.2d 785; No. 15354, Wesley West, 236 F.2d 785; No. 15471, Gulf Oil Corporation and Gulf Refining Company, 236 F.2d 812; No. 15470, The Texas Company, 236 F.2d 813; No. 15461, Union Oil Company of California and Louisiana Land and Exploration Company, 236 F.2d 816. II. Suspension cases: No. 15704, Humble Oil & Refining Company, 236 F.2d 819; No. 15627, Stanolind Oil & Gas Company, 236 F.2d 824; No. 15678, Continental Oil Company, 236 F.2d 827; No. 15799, Hunt Oil Company, 236 F.2d 828; No. 15298, Hunt Oil Company, 236 F.2d 828; No. 15461, Union Oil Company of California, Louisiana Land and Exploration Company, 236 F.2d 816. III. Abandonment Cases; No. 15832, Shank, Trustee, 236 F.2d 830; No. 14749, Roy Lee, Trustee, 236 F.2d 835. IV. State Tax Escalation Cases: Nos. 15706 through 15721, Continental Oil Company, 236 F.2d 839
 This division is for convenient, orderly presentation, but the entire opinion applies to all of the cases without regard to topical or category subdivisions.
 
 
 [3]
 "The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control." Columbia Broadcasting System, Inc., v. United States, supra, at 316 U.S. 425, 62 S.Ct. 1204, 86 L.Ed. 1575. "The regulations here prescribe rules which govern the contractual relationships between the stations and the networks. * * * The regulations are not any the less reviewable because their promulgation did not operate of their own force to deny or cancel a license. It is enough that failure to comply with them penalizes licensees, and appellant, with whom they contract." Id., at 316 U.S. 417, 62 S.Ct. 1200, 86 L.Ed. 1571. "Here the Commission exercised its rule-making power by adopting regulations whose operation is not made subject to future administrative determinations, save only as the Commission may be called on to decide in any given case whether a station's contract with a network is within the regulations. The regulations' applicability to all who are within their terms does not depend upon future administrative action. Instead they operate to control such action and to determine in advance the rights of others affected by it. * * *" Id., at 316 U.S. 420, 62 S.Ct. 1202, 86 L. Ed. 1573
 Federal Communications Com. v. American Broadcasting Co., 347 U.S. 284, 74 S. Ct. 593, 98 L.Ed. 699, reviewed and enjoined similar general regulations applicable to all. See also, Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817.
 
 
 [4]
 Section 21(b), 15 U.S.C.A. § 717t(b): "Any person who willfully and knowingly violates any rule,regulation, restriction, condition, or order made or imposed by the Commission under authority of this act, shall, in addition to any other penalties provided by law, be punished upon conviction thereof by a fine of not exceeding $500 for each and every day during which such offense occurs." [Italics mine.]
 
 
 [5]
 Mr. Justice Frankfurter's dissent in Columbia, supra, 316 U.S. 429, 433, 434, 62 S.Ct. 1206, 1208, 86 L.Ed. 1577, 1580, characterized the prior cases of reviewability, "In each one the force of the law either through criminal prosecution or injunction or fine or some other judicial remedy could immediately be brought to bear to enforce the command of the administrative agency." His comment analyzing United States v. Berwind-White Coal Mining Co., 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204, as well as the other cases, United States v. Baltimore & Ohio Railroad Co., 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587; American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142; Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 32 S.Ct. 436, 56 L.Ed. 729; Chicago, R. I. & P. R. Co. v. United States, 284 U.S. 80, 52 S.Ct. 87, 76 L.Ed. 177; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S. Ct. 754, 83 L.Ed. 1147, involving specific penalties for violation of regulations, is significant: "Since the order of the Commission commanded carriers to take specified actions, and since the failure to comply with the order would bring immediate legal sanctions, the order was held reviewable." Id. at 316 U.S. 434-436, 62 S. Ct. 1208, 1209, 86 L.Ed. 1580, 1581
 
 
 [6]
 The key to the majority's misreading of Columbia is found, I think, in the preoccupation in the Magnolia opinion (No. 15320) with some supposed peculiar difference between a Section 402(a), Title 47 U.S.C.A. § 402, Urgent Deficiencies Act, October 22, 1913, 38 St.L. 208, 219, Chap. 32, and a Section 402(b) review which, for all practical purposes, is the same as Section 19(b) here. Significantly, Mr. Justice Frankfurter in his Columbia dissent completely ignored that point and in neither of the dissents in Frozen Food Express or Storer is it even mentioned as a valid basis for distinction. In Storer, of course, it was our precise situation — a statutory review by the Court of Appeals. In 402(a) and (b) and in 19(b), the requirement of an "Order" and the basis for reviewability is substantially the same. Scripps-Howard Radio, Inc., v. Federal Communication Commission, 316 U.S. 4, 15, 16, 62 S.Ct. 875, 882, 86 L.Ed. 1229, 1237, "It is urged that the orders reviewable under § 402(a) * * * are intrinsically different from those reviewable under § 402(b). But while the two sections route appeals to different courts, the differentiation was in large measure the product of Congressional solicitude for the convenience of litigants. It had no relation to the scope of the judicial function which the courts were called upon to perform * * *. As the legislative history of the Act plainly shows, Congress provided the two roads to judicial review only to save a licensee the inconvenience of litigating an appeal in Washington * * *." See also, Philadelphia Co. v. S. E. C., 82 U.S.App.D.C. 335, 164 F. 2d 889, at page 897, certiorari denied 333 U.S. 828, 68 S.Ct. 452, 92 L.Ed. 1113, subsequent proceedings 84 U.S. App.D.C. 73, 175 F.2d 808, reversed as moot 337 U.S. 901, 69 S.Ct. 1047, 93 L. Ed. 1715
 Amshoff v. United States, 7 Cir., 228 F.2d 261, certiorari denied 351 U.S. 939, 76 S.Ct. 836, under the Hobbs Act, 5 U.S.C.A. § 1031 et seq., likewise reviewed, over the Administrator's contention that no definitive order had been entered, a general regulation which had the effect (as does much of the 174 Orders here) of repudiating an old and adopting a new administrative substantive policy.
 The majority's emphasis (Magnolia 15320) on the requirement for, "A transcript of the record upon which the order complained of was entered" and the usual situation of an order, "of a definitive character dealing with the merits of a proceeding before the Commission and resulting from a hearing upon evidence and supported by findings appropriate to the case, Federal Power Commission v. Metropolitan Edison Co., 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408 * * *" cannot, by a bootstrap-lifting process, defeat reviewability. The absence of a hearing, the receipt of evidence, the making of findings which is the very basis of much of the attack cannot thus be turned into a deficiency making it unreviewable, National Coal Association v. Federal Power Comm., 89 U.S.App.D.C. 135, 191 F.2d 462, 466; Saxton Coal Mining Co. v. National Bituminous Coal Comm., 68 App.D.C. 245, 96 F.2d 517; American Sumatra Tobacco Corp. v. S. E. C., 68 App.D.C. 77, 93 F. 2d 236; Philadelphia Co. v. S. E. C., supra; see also, Columbia Oil & Gasoline Corp. v. S. E. C., 3 Cir., 134 F.2d 265, 267. And, of course, where validity of regulation presents question of law on the face of the orders or regulations a "record" of evidence is not needed, see discussion of cases under II, Suspension Cases, infra.
 
 
 [7]
 § 154.91 "`Independent producer' as that term is used in these Rules means any person as defined in the Natural Gas Act who isengaged in the production or gathering of natural gas and who transports natural gas in interstate commerce or sells natural gas in interstate commerce for resale, but who is not primarily engaged in the operation of an interstate pipeline." [Italics mine]
 
 
 [8]
 Original Order 174 in the prefatory portions stated: "The decision of the United States Supreme Court on June 7, 1954, in Phillips Petroleum Co. v. [State of] Wisconsin, (347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035) holds that persons engaged in the production and gather of natural gas but which also transport natural gas in interstate commerce or make sales in interstate commerce for resale are `natural gas companies' subject to all the requirements of the Natural Gas Act. * * *"
 In the Commission's brief in No. 15471, Gulf Oil Corporation, pages 1 to 3: "* * * These orders [174] stem directly from the decision of the Supreme Court in Phillips Petroleum Co. v. [State of] Wisconsin * * * in which that court held that the Commission has jurisdiction over independent producers which engage `in "the sale in interstate commerce of natural gas for resale," and that such a company' is a `"natural gas company" within the meaning of that term as defined in the Natural Gas Act' (347 U.S. at page 677, 74 S.Ct. at page 796). By these orders the Commission * * * promulgated general rules and regulations to be applicable to natural-gas companies which were also independent producers subject to Commission jurisdiction under the Act. * * * the Supreme Court held in Phillips Petroleum Co. v. [State of] Wisconsin, * * * that sales in interstate commerce for resale by producers and gatherers to interstate pipeline companies do not come within the `production or gathering' exemption, but that producers and gatherers making such sales also are `natural-gas companies' under the Act, and the Commission has the authority to regulate such sales."
 The Commission's brief in Magnolia No. 15320, page 4: "* * * the Supreme Court on June 7, 1954, held that the Commission had jurisdiction over sales of natural gas in interstate commerce for resale, including such sales in the area of production and gathering * *."
 This "extreme" view of the Phillips decision was successfully pressed by the the Commission in Federal Power Comm. v. J. M. Huber, D.C.D.N.J., 133 F.Supp. 479 (now on appeal Third Circuit).
 
 
 [9]
 In the Phillips case, 347 U.S. at page 678, 74 S.Ct. at page 797, 98 L.Ed. at pages 1045-1046, the court reaffirms the previous cases on Section 1(b): "In Federal Power Commission v. Panhandle Eastern Pipeline Co., 337 U.S. 498, 505, 69 S.Ct. 1251, 1256, 93 L.Ed. 1499, we observed that the `natural and clear meaning' of the phrase `production or gathering of natural gas' is that it encompasses `the producing properties and gathering facilities of a natural-gas company.' Similarly, in Colorado Interstate Gas Co. v. Federal Power Comm., 324 U.S. 581, 598, 65 S.Ct. 829, 837, 89 L.Ed. 1206 we stated that `(t)ransportation and sale do not include production or gathering', and indicated that the `production or gathering' exemption applies to the physical activities, facilities, and properties used in the production and gathering of natural gas. Id., 324 U.S. at pages 602-603, 65 S.Ct. at page 839. See also, Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 612-615, 64 S.Ct. 281, 292-294, 88 L.Ed. 333 [350-352]; Peoples Natural Gas Co. v. Federal Power Comm., 75 U.S.App.D.C. 235, 127 F.2d 153; cf. United States v. Public Utilities Comm., 345 U.S. 295, 307-311, 73 S.Ct. 706, 713-716, 97 L.Ed. 1020. * * *"
 
 
 [10]
 Order 174 A, Section 154.92, "(a) Every independent producer who, on or since June 7, 1954, has engaged in the interstate * * * sale of natural gas subject to the jurisdiction of the Commission shall on or before October 1, 1954, [subsequently changed to December 1, 1954] file with the Commission rate schedules, as defined in Section 154.93 hereof, setting forth the terms and conditions of service and all rates and charges for such * * * sale effective on June 7, 1954. * * * (b) Every independent producer who, subsequent to the effective date of these rules, proposes to initiate an interstate * * * sale * * to an existing or new customer shall file with the Commission not less than 30 days nor more than 60 days * * * a rate schedule * * *."
 
 
 [11]
 Section 4(c) of the Act: "Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within suchtime * * * and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission * * *." [Italics mine.]
 Whatever may be the juridical metaphysics, e. g., Douglas v. County of Pike, 101 U.S. 677, 25 L.Ed. 968; Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178, of what the 1954 Phillips decision did to a 1938 Act, it is plain that the Commission never claimed that it had the right to or was regulating these independent producers, Columbian Fuel Corporation, 2 FPC 200; Fin-Ker Oil and Gas Production Co., 6 FPC 92; Chicago Corporation, 6 FPC 98; Phillips Petroleum Co., 10 FPC 246, and to suggest now that on the birth of Phillips, the general regulations covering interstate transmission pipeline companies applied automatically to these individual producers lacks genuine substance.
 
 
 [12]
 It should be borne in mind that questions of this type stated in emphatic terms are not to be taken as a conclusion that such Governmental supervision is wrong or invalid, or that the regulation is. We are here concerned only with an analysis of the Court's theme that Order 174 has no effect upon, does not require action by, these petitioning gas producers
 
 
 [13]
 Section 154.94 (Order 174 A): "The operation of any provision of the rate schedule providing for future or periodic changes in the rate, charge, classification, or service after June 7, 1954, or the effective date of any rate schedule for initial service after June 7, 1954, shall constitute a change in rate schedule."
 Substantially the same provision is contained in Section 154.94(c) of Order 174 B except that this Section has been made even more specifically applicable to price changes provided for in an "initial rate schedule." In addition, Order 174 B, Section 157.25, condemns, in advance, escalator clauses in producer contracts submitted in support of applications for Certificates which would, of course, affect interstate transmission pipeline companies, since long-term contracts for their essential gas reserves which have heretofore contained escalation clauses (see note 14 infra) could no longer contain them. This is thus a radical departure on a wide front from former substantive policies.
 
 
 [14]
 Reference hereto the Suspension Cases, and particularly Stanolind (No. 15627) and Continental Oil Co. (No. 15678), involving as they do gas from the Woodlawn Field, Texas, removes this from the dreaded vacuum. The Federal Power Commission in the Mississippi River Fuel Corporation case (Docket G-1281, et al.) in 1952 stated: "The most important matter presented for consideration in the instant Mississippi certificate proceedings concerns the adequacy of the gas supply showing made by Mississippi in support of its proposed system expansion. The importance of an adequate gas supply showing has been stressed by the Commission in certificate proceedings, since every certificate of public convenience and necessity under the Natural Gas Act must be based upon appropriate findings, among others, that the applicant for such certificate is `able and willing properly to do the acts and to perform the service proposed.' `An adequate gas supply', as the Commission stated in its Opinion No. 230 and Order of June 24, 1952, In the Matter of Northern Natural Gas Company, Docket No. G-1618 * * *, `is the bedrock upon which such findings must be grounded.' `A gas supply can be considered adequate,' as the Commission further stated in the Northern case, supra, `only if the volume available is sufficient to meet the demand requirements for the service proposed, if such volume is assured over a sufficient period of years to justify the expenditures required for the construction of the proposed pipe-line project, and if that assurance of a continuing supply of natural gas meets the requirements of public convenience and necessity Generally, a supply of natural gas should be assured for a period approximating fifteen to twenty years, dependent upon the particular facts involved, if the pipeline project is to be economically sound and in the public interest and if the natural-gas company is to be in position to meet its obligations to investors and provide dependable service to consumers.'" The Commission then recited that they had previously found Mississippi's supplies inadequate but allowed additional time to correct it. Acquisition of additional reserves is approved: "* * * At the 1952 hearings Mississippi showed that it had entered into additional gas purchase contracts, covering the purchase of gas in the * * * Woodlawn gas fields in Texas * * *. These contracts are for primary terms of 20 years and provide prices ranging between 10.88¢ and 12.46¢ per Mcf * * * at the beginning of their terms, and thereafter higher prices are specified. * * *"
 Another Suspension Case, Union Oil (No. 15461), involves suspension of escalated rates under a long-term contract with Transcontinental Pipe Line Company resulting from a renegotiation of the contract long prior to June 7, 1954, made primarily to meet the objections of the Federal Power Commission in Dockets No. G-2367 and G-4185 (see opinions No. 279 and 280, December 1954, March 1955, respectively) to sufficiency of gas reserves. After restudy of the gas supply reserves showed them to be 16.6 to 17.9 years, Transcontinental's application for certificate to build and finance facilities costing approximately $40,000,000.00 to compete for the rich New York market area was approved.
 
 
 [15]
 It is doubtful that Government (Administrators) should ever be permitted, in insulating their actions from judicial review, to assert that the citizen must run the bold course of defiance as a means of testing legality. "Most rules of conduct having the force of law are not self-executing but require judicial or administrative action to impose their sanctions with respect to particular individuals. Unlike an administrative order or a court judgment adjudicating the rights of individuals, which is binding only on the parties to the particular proceeding, a valid exercise of the rule-making power is addressed to and sets a standard of conduct for all to whom its terms apply. It operates as such in advance of the imposition of sanctions upon any particular individual. It is common experience that men conform their conduct to regulations by governmental authority so as to avoid the unpleasant legal consequences which failure to conform entails. * * *" Columbia Broadcasting System, supra, 316 U.S. at page 418, 62 S.Ct. at page 1201, 86 L. Ed. at page 1571
 
 
 [16]
 This is what the producers sought to do in the Abandonment Cases (Lee, Trustee 15749; Shank, Trustee 15832), but which, for nearly two years, the Commission has thus far prohibited
 
 
 [17]
 Section 4(e), "Whenever any such new schedule is filed the Commission shall have authority * * * to enter upon a hearing concerning the lawfulness of such rate, * * * pending such hearing * * * may suspend the operation of * * * such rate * * *. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, * * *."
 
 
 [18]
 United States v. Bethlehem Steel Corp., 315 U.S. 289, 298, 62 S.Ct. 581, 586, 86 L.Ed. 855, 862: "The Master and the courts below, however, treated these clauses as non-severable; to do otherwise would call for departure from accepted principles of the law of contract. Whether a number of promises constitute one contract or more than one is to be determined by inquiring `whether the parties assented to all of the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.' Williston on Contracts, Rev.Ed., § 863, and cases there cited."
 
 
 [19]
 "The powers of the Commission are defined by §§ 4(e) and 5(a). The basic power of the Commission is that given it by § 5(a) to set aside and modify any rate or contract * * *. It is simply the power to review rates and contracts made in the first instance by natural gas companies and, if they are determined to be unlawful, to remedy them. Section 5 (a) would of its own force apply toall the rates of a natural gas company, whether long-established or newly changed, but in the latter case the power is further implemented by § 4(e). All that § 4(e) does, however, is to add to this basic power, in the case of a newly changed rate or contract * * * the further powers (1) to preserve the status quo * * * by suspending its operation * * * and (2) thereafter to make its order retroactive, by means of the refund procedure * * *." United Gas Pipeline Co. v. Mobile Gas Corp., supra [350 U.S. 332, 76 S.Ct. 379]. [Italics by the Court.]
 
 
 [20]
 The Commission's letter report May 4, 1956, to Senator Gore revealed 191 cases involving annual increases (not including state tax increases) of $18,737,482.00 in which escalation rate increases have been suspended and hearing or decision is pending. Presumably, at least 5/12ths (5 months maximum suspension period) of this is an irretrievable loss to producers even though the Commission ultimately approves the increased rate. Apparently only 39 cases have been disposed of involving $3,218,297.00 annual increases, and the Examiner's reports and Commission decisions thereon submitted as typical examples of the Administrative problems indicate the complex matters which an applicant must face and perhaps shoulder in showing the proposed increase to be just and reasonable, e. g., is a fair price to be determined by the going price in the field? By invested capital, and if so, upon what basis, per well, or field, or unit? By a desired rate of return and if so, what percentage and upon what base?
 
 
 [21]
 Section 157.23(a): "Every independent producer of natural gas who, on or since June 7, 1954, has engaged in the interstate * * * sale of natural gas subject to the jurisdiction of the Commission * * * shall * * * file with the Commission an application * * *. (b) No independent producer of natural gas shall, * * * engage in any new service with respect to the * * * interstate * * * sale of such natural gas for resale in interstate commerce * * * without approval of the Commission, evidenced by a certificate of public convenience and necessity * * *" The contents of the applications are carefully prescribed concerning exhibits, technical data required, etc
 
 
 [22]
 Order No. 174 A provided: Section 157.28 "No independent producer as defined in Section 154.91 of these rules shall abandon any sale, transportation or service, subject to the jurisdiction of the Commission, being rendered on or since June 7, 1954, without the express permission and approval of the Commission first had and obtained * * *."
 In Order No. 174 B this was changed by substituting the words of Section 7 (b) of the Act and adding the proviso: "Provided, however, That nothing herein shall be construed as interfering or as intended to interfere with or to prevent compliance by a natural-gas company with valid conservation orders of a State agency relating to the production or gathering of natural gas."
 The Abandonment Cases before us and other administrative action taken indicates that in the administrative application by the Commission there is no difference between 174 B and 174 A for sales are considered "service rendered by * * * such facilities" and abandonment of a sales contract by an "Independent Producer" is forbidden: see J. M. Huber Corp. and Northern Natural Gas Co. v. J. M. Huber Corp., Dockets No. G-4326 and G-4957, Federal Power Commission v. J. M. Huber Corp., D.C. N.J., 133 F.Supp. 479; J. M. Huber Corp. v. Federal Power Commission, 3 Cir., 236 F.2d 550; Skelly Oil Co. and Lone Star Gas Co. v. Skelly Oil Co., Dockets No. G-5380 and G-5260; Argo Oil Corp., et al., Dockets No. G-6810, G-6811, G-2591 and G-2950.
 
 
 [23]
 The command to apply for a certificate is found in Section 7(c). Its opening sentence restricts it to the completion of proposed facilities: "No natural-gas company or person whichwill be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas * * *." (Italics mine.) This was the amendment of February 7, 1942, Public Law No. 444, 77th Congress, Chapter 49, Second Session [H.R. 5249], 56 Stat. 83. In its original form the Act required a certificate only when a company was entering a "market in which natural gas is already being served by another natural-gas company * * *" As investors and promoters were unwilling to risk the building of a line unless the statutory condition were met, it resulted in invariable hearings to prove the negative. The amendment was sought by the Commission to require certificates in the case of all construction, see hearings on H.R. 5249, 77th Congress, page 15 et seq.
 
 
 [24]
 Section 7(b), "No natural-gas company shall abandon all or any portion of itsfacilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities * * *." [Italics mine.]
 
 
 [25]
 The Act originated in H.R. 5423, 74th Congress, as amendments to the Public Utility Act of 1935, 15 U.S.C.A. § 79 et seq., with a "facilities" provision identical with Section 7(b) (see hearings H.R. 5423, 74th Congress, 1st Session, pages 32, 44, § 305(b)); the next bill, H.R. 11662, 74th Congress, 2nd Session, contained no prohibition on abandonment and representatives of the State Commissioners proposed an amendment that, "No gas company * * * shall discontinue service * * *," but this was rejected and language of present § 7(b) was used. In the 75th Congress, 1st Session, on H.R. 4008, efforts by the New York Public Service Commission to obtain an amendment, "No natural gas company shall abandon service to any of its customers * * *" failed, and H.R. 6586, 75th Congress, 1st Session, which became the Act, contained the language now found in § 7(b). The Committee report, No. 709, 75th Congress, 1st Session, stated, "Subsection (b) requires approval of the Commission by any natural gas company desirous of abandoning any or all of its facilities subject to the jurisdiction of the Commission * * *."
 
 
 [26]
 By letter, June 17, 1955, from Chairman Kuykendall, Federal Power Commission, to Chairman of the Senate Committee on Interstate and Foreign Commerce, amendment of Section 7(b) was proposed to make clear "* * * that the Commission is authorized to pass upon the proposed abandonment of any sales in interstate commerce for resale by independent producers." See hearings, 84th Congress, 1st Session, on S. 712 et al., pages 1234, 1235. No such bill was passed. Apparently the Commission has sought from Congress legislation designed to impose a general service obligation, see hearings, 80th Congress, H.R. 4051, pages 99, 100, 428-430, 461-462, and has sought to amend Section 7(b), see Annual Reports 1951 at page 145; 1952 page 152; 1953 page 155; 1954 page 170
 
 
 [27]
 The Commission's Order forbidding the transfer of leases was reversed: "The Commission seeks to distinguish between the activities of production and gathering, such as drilling, spacing wells, or collecting gas, and the facilities, such as reserves and gas leases, used therefor and argues that only the former were excluded from the coverage of the Act. * * * In Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 603, 65 S.Ct. 829, 839, 89 L.Ed. 1206, we said that this phrase comprehended the producing properties and gathering facilities of a natural-gas company. We now adhere to this natural and clear meaning of the words and their obvious expression of congressional intent. Of course leases are an essential part of production. * * * The Federal Power Commission leans heavily upon § 7 (b) * * *. The argument here is that since natural gas is the `lifeblood' of a pipe-line system, a company by disposing of its gas reserves, unhampered by Commission control, may render itself unable to continue service; consequently abandonment of facilities and service without the consent of the Commission will result. The argument begs the question. The section, like those above, covers only `facilities subject to the jurisdiction of the Commission.'" Federal Power Commission v. Panhandle Eastern Pipe Line Co., supra, at 337 U.S. 504-509, 69 S.Ct. 1256, 93 L.Ed. 1504-1507. And see Colorado Interstate Gas Co. v. Federal Power Commission, supra, Interstate Natural Gas Co. v. Federal Power Commission, 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, approved expressly in the Phillips decision
 
 
 [28]
 Federal Power Commission v. Hope Natural Gas Co., supra; State Corporation Commission of Kansas v. Federal Power Commission, 8 Cir., 215 F.2d 176; Hope Natural Gas Co. v. Federal Power Commission, 4 Cir., 134 F.2d 287, 310, "The Natural Gas Act shows clearly that it was the intention of Congress to give the Commission * * * regulatory power as to future rates; but there is no indication of any intention to clothe it with judicial or quasi-judicial powers with respect to past charges or practices, such as was vested in the Interstate Commerce Commission * * *. As the Commission itself says, it was not given authority to fix rates for the past or to award reparations on account of past rates."
 
 
 [29]
 To the familiar lament from the Commission, the Court stated at 201 F.2d 572: "We are not impressed with the argument that we are without jurisdiction in the premises * * *. The commission argues that the order which we are asked to review is not a definitive or final order * * *; but our power to review is not limited to final orders. * * * The order which we are asked to review is therefore sufficiently distinct from the general subject of the litigation and sufficiently final and definitive to justify us in exercising the power of review vested in us by the statute."
 
 
 [30]
 The same objection was made: "Reviewability is thus not strictly limited to final orders. * * * And, reviewability extends to an order issued by the Commission which finally determines the legal rights of the parties with respect to matters within the scope of review. See Atlantic Seaboard Corp. v. Federal Power Commission, 4 Cir., 201 F.2d 568; * * *. The orders sought to be reviewed here do not deal with the merits of the proceedings before the Commission in the sense that they were entered upon evidence concerning the reasonableness of the rates. They do not purport to finally determine Phillips' wholesale rates. That matter is left to a conventional hearing in these proceedings. But the orders do purport to establish with finality the wholesale rates which Phillips was authorized to charge Michigan on June 7, 1954 * * * the legal consequences which attach to these orders have conclusive effect upon the rights and duties of Phillips as an independent producer * * * and they are therefore reviewable." 227 F.2d at page 474
 
 
 [31]
 See Amarillo-Borger Express v. United States, D.C.N.D.Tex., 138 F.Supp. 411, expressly approved and followed in Long Island Railroad Co. v. United States, D.C. E.D.N.Y., 140 F.Supp. 823 (statutory three-judge courts), in which an illegal revocation of a suspension order by the Interstate Commerce Commission was enjoined. The extensive materials dealt with under the Administrative Procedure Act raises considerable doubt in my mind that the Court's action here, in rejecting the Administrative Procedure Act, is correct. Of course, reviewability depends on the statutes and not what the parties say they invoke. See footnotes 2, 3 and 4, United States v. Storer Broadcasting Co., supra
 
 
 [32]
 On the review, if granted, there would be a substantial question whether the Commission had the right to "reject", as they did, one or more of these filings. Mississippi River Fuel Corp. v. Federal Power Commission, 3 Cir., 202 F.2d 899
 
 
 On Petition for Rehearing
 
 75
 PER CURIAM.
 
 
 76
 As neither of the judges who concurred in the decision of the court in the above numbered and entitled cause is of opinion that the petition for rehearing should be granted, it is ordered that the said petition be, and the same is hereby, denied.
 
 
 77
 JOHN R. BROWN, Circuit Judge, dissents.